## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **STATION 6, L.L.C.,** | ) | |
| | ) | **Civil Action No.: 2:20-CV-01371** |
| **Plaintiff,** | ) | |
| | ) | **Section:    R** |
| **v.** | ) | |
| | ) | **Judge:      Hon. Sarah Vance** |
| **CERTAIN UNDERWRITERS AT** | ) | |
| **LLOYD'S, LONDON,** | ) | **Magistrate:  Hon. Michael North** |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

### CERTAIN UNDERWRITERS AT LLOYD'S, LONDON'S
### MEMORANDUM IN SUPPORT OF RULE 12(b)(6)
### MOTION TO DISMISS COMPLAINT

**MAY IT PLEASE THE COURT:**

Defendants, Certain Underwriters at Lloyd's, London subscribing to Policy No. 02079/AML001 (incompletely named in the Complaint as "Certain Underwriters at Lloyd's, London" and hereinafter "Underwriters"), submit this memorandum in support of their Rule 12(b)(6) Motion to Dismiss Complaint.

## I.    EXECUTIVE SUMMARY

Plaintiff in this putative class action, Station 6, L.L.C. ("Plaintiff"), seeks insurance coverage for business interruption related to the COVID-19 pandemic from.

Plaintiff's Complaint must be dismissed for several reasons:

(1) The insurance policy at issue is a Commercial Property policy that insures Plaintiff's property against direct physical loss or damage.  The policy does provide "Business Income" coverage, but to trigger coverage, there must be direct physical loss of or damage to the insured property that results in the loss of income.  Plaintiff's Complaint

fails to allege any property damage, as a condition precedent to the coverage sought, nor could it allege such damage under the circumstances.

(2)  The policy also provides Business Income coverage if a civil authority prohibits access to insured property because of direct physical damage to surrounding properties. Again, Plaintiff fails to allege direct physical damage to nearby property or that access to the insured property was ever prohibited by a civil authority because of such direct physical damage, which further resulted in a loss of income to Plaintiff.

(3)  Even if the policy's requirements discussed above had been met, coverage is excluded for any losses caused directly or indirectly by, or related in any way to the presence of "organic pathogens," which is defined to include viruses. The novel Coronavirus, also known as SARS-CoV-2, is unquestionably a virus, and Plaintiff alleges that its claim arises, directly or indirectly, out of the virus.

(4)  Similarly, the policy contains a microorganism exclusion, which precludes coverage for any claim arising directly or indirectly out of a microorganism. SARS-CoV-2 is also unquestionably a microorganism.

(5)  The Complaint fails to sufficiently allege a cause of action for breach of contract, as Plaintiff provides no supporting facts to support required elements for this claim.

Accordingly, Underwriters' Rule 12(b)(6) Motion to Dismiss should be granted

## II.    FACTUAL BACKGROUND

### A.    THE POLICY

Plaintiff owns and operates a seafood restaurant located in Metairie, Louisiana. Underwriters subscribed to a policy that insures the property on which the restaurant is located. Policy No. 02079/AML001, issued to Plaintiff, provides coverage for direct physical loss of or

damage to the property located at 105 Metairie-Hammond Highway, Metairie, LA 70005[1] (the

"Property") effective for the policy period of May 31, 2019 to May 31, 2020 (the "Policy").

(Exhibit A).[2]

    The Policy's insuring clause provides:

**A. Coverage**

We will pay for direct physical loss of or damage to Covered Property at the
Premises described in the Declarations caused by or resulting from any Covered
Cause of Loss.

(Policy, Exhibit A, Form CP 00 10 04 02, at p. 1 of 14).  "Covered Cause of Loss" is defined in

the Policy as "Risks of Direct Physical Loss unless the loss is… excluded… or…limited." (Policy,

Exhibit A, Form CP 10 30 04 02, at p. 1 of 9).

    While the Policy does provide coverage for loss of "Business Income," the loss must also

arise out of direct physical loss or damage to the insured property as identified in the "declarations"

page of the Policy.  With respect to business income, the Policy's "Business Income" coverage

states, in part:

**1. Business Income**
                       \* \* \*

We will pay for the actual loss of Business Income you sustain due to the
necessary "suspension" of your "operations" during the "period of restoration".
***The "suspension" must be caused by direct physical loss of or damage to
property at premises which are described in the Declarations*** and for which a
Business Income Limit of Insurance is shown in the Declarations and for which
a Business Income Limit of Insurance is shown in the Declarations. The loss or
damage must be caused by or result from a Covered Cause of Loss.

(Policy, Exhibit A, Form CP 00 30 04 02, at p. 1 of 11) (***emphasis added***).

---

[1] The insured property is identified on the Schedule of Locations of the Policy.
[2] A copy of the Policy was not attached to Plaintiff's Complaint, but may be considered by the Court on a motion to
dismiss for failure to state a claim.  *In re Katrina Canal Breaches Litig.,* 495 F.3d 191, 205 (5th Cir.2007)

The Policy also provides coverage for "Extra Expense" which is defined, in part, as:

**2. Extra Expense**

    **a.** Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no ***direct physical loss or damage to property*** caused by or resulting from a Covered Cause of Loss.

(Policy, Exhibit A, Form CP 00 30 04 02, at p. 1 of 11) (***emphasis added***). As noted above, "Business Income" and "Extra Expense" coverages are only provided during the "period of restoration" which is defined as:

… the period of time that:

a.  Begins:

    (1) 72 hours after the time of ***direct physical loss or damage*** for Business Income Coverage; or

    (2) Immediately after the time of ***direct physical loss or damage*** for Extra Expense Coverage;

caused by or resulting from any Covered Cause of Loss at the described premises; and

b.  Ends on the earlier of:

    (1) The date when the property at the described premises should ***be repaired, rebuilt or replaced*** with reasonable speed and similar quality; or

    (2) The date when business is resumed at a new permanent location.

(Policy, Exhibit A, Form CP 00 30 04 02, at p. 9 of 11) (***emphasis added***). In other words, the Policy does not provide coverage for business income and extra expense if the loss is caused by something other than direct physical loss or damage resulting from a covered cause of loss. And coverage is only provided for that time needed to repair, rebuild, or replace the damaged property.

The Policy provides "Civil Authority" coverage but, and again consistent with the fundamental principle of a property insurance policy, direct physical loss or damage to property is required as the civil authority action must result from damage to property caused by a Covered Cause of Loss:

### a. Civil Authority

We will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises ***due to direct physical loss of or damage to property***, other than at the described premises, caused by or resulting from any Covered Cause of Loss.

The coverage for Business Income will begin 72 hours after the time of that action and will apply for a period of up to three consecutive weeks after coverage begins.

The coverage for Extra Expense will begin immediately after the time of that action and will end:

**(1)** 3 consecutive weeks after the time of that action; or
**(2)** When your Business Income coverage ends;

whichever is later.

(Policy, Exhibit A, Form CP 00 30 04 02, at p. 2 of 11) (***emphasis added***).

The Policy contains certain applicable exclusions. Among those exclusions are a broad "organic pathogen" exclusion which excludes claims arising out of viruses (Policy, Exhibit A, Form GSC-CP-007 09 07) and the microorganism exclusion (Policy, Exhibit A, Form LMA 5018).

### B.    THE INSURANCE CLAIM

On March 19, 2020, Plaintiff submitted a claim seeking recovery for business income loss due to city closures related to COVID-19 (the "Claim"). Underwriters began their investigation of the Claim and issued a reservation of rights letter to Plaintiff on April 16, 2020, notifying Plaintiff of certain potential coverage issues. (Doc. 1, ¶ 27). Shortly after Underwriters issued the Reservation of Rights Letter, Plaintiff filed this lawsuit. (*See id.*). In the Complaint, Plaintiff alleges that Plaintiff "has suffered and will continue to suffer a direct physical loss of and damage to its property." (Doc. 1, ¶ 24). The Complaint also alleges that a March 17, 2020 Executive Order issued by Louisiana Governor John Bel Edwards "requir[ed] all restaurants, bars, pubs, and similar establishments to close-on premise food services." (*Id.* at ¶ 17). On March 23, 2020, Governor

5

Edwards issued a second order, "restricting public access to non-essential business and limiting restaurants to take out only." (*Id.* at ¶ 18). Notably, however, the Complaint fails to provide any description of "direct physical loss and damage" to the insured Property or provide any evidence that Plaintiff was required to cease operations. Instead, the Complaint gives a cursory recitation of the fact that Governor Edwards issued three orders, with no comment whatsoever on the impact of those orders on Plaintiff's business.

The Governor's orders were ostensibly put in place to promote social distancing and slow the spread of COVID-19 by minimizing contact between residents. These orders were not issued as a result of any "direct physical loss of or damage" to property, as required under the Policy to trigger coverage. Moreover, the orders did not "prohibit access" to the Property, as they only restricted public access to the Property, and they did not restrict Plaintiff, nor its employees, from entering the premises or from continuing operations for the take-out business permitted by the orders. Specifically, one of the orders referenced in Plaintiff's Complaint stated that businesses closed to the public "shall not be prohibited from conducting necessary activities such as payroll, cleaning services, maintenance or upkeep as necessary." (*See* Doc. 1, ¶ 18).

### III.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) mandates dismissal of a complaint if it fails to state a claim upon which relief can be granted. A plaintiff is obligated to provide the grounds of entitlement to relief, "which requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Id.* at 570. A claim has "facial plausibility" when the facts pleaded allow the court to draw a reasonable inference "that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court is not bound to accept a legal conclusion as

6

true when considering a motion to dismiss. *Id.* "Dismissal is appropriate when the complaint 'on its face show[s] a bar to relief.'" *Cutrer v. McMillan*, 308 F. App'x 819, 820 (5th Cir. 2009). When the plain language of an insurance policy precludes coverage, it is proper to dismiss a case seeking coverage. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 221 (5th Cir. 2007).

Louisiana law controls the interpretation of the Policy, which was issued to Plaintiff in Louisiana and insures risks located in Louisiana. *See Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007). Under Louisiana law, "[a]n insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Louisiana Civil Code." *Id.* at 206, quoting *Cadwallader v. Allstate Ins. Co.*, 848 So. 2d 577, 580 (La. 2003). An insurance contract "is the determination of the common intent of the parties," and when the words of the contract "are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." *Id.*, citing LA. CIV. CODE ANN. arts. 2045-46. Interpretation of an insurance contract is generally a question of law, and the policy must be "'construed according to the entirety of its terms and conditions as set forth in the policy....'" *Id.* (quoting LA. R.S. 22:881).

A court is to interpret an insurance policy using the "general, ordinary, plain and popular meaning of the words used in the policy, unless the words have acquired a technical meaning." *La. Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 630 So. 2d 759, 763 (La. 1994); LA. CIV. CODE ANN. art. 2047. A court should utilize the "generally prevailing meaning" of words in the policy, and may consult dictionaries, treatises, and jurisprudence as appropriate to ascertain the generally prevailing meaning. *Canal Breaches Litig.*, 495 F.3d at 210.

When the contractual language is "clear and explicit and leads to no absurd consequences, no further interpretation may be made in search of the parties' intent[.]" LA. CIV. CODE art. 2046,

and "the insurance contract must be enforced as written." *Bennett v. Hartford Ins. Co. of Midwest*, 890 F.3d 597, 605 (5th Cir. 2018) (quoting *Cadwallader*, 848 So.2d at 580). An insurance contract must be "construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any rider, endorsement, or application attached to or made a part of the policy." La.R.S. § 22:881.

If the insurance contract terms are ambiguous, these ambiguities are generally strictly construed against the insurer and in favor of coverage. *Pioneer Exploration, LLC v. Steadfast Ins. Co.*, 767 F.3d 503, 512-13 (5th Cir. 2014). However, this rule of strict construction "applies only if the ambiguous policy provision is susceptible to two or more *reasonable* interpretations; for the rule of strict construction to apply, the insurance policy must not be only susceptible to two or more interpretations, but each of the alternative interpretations must be reasonable." *Id.* at 513.

Insurance companies have the right to limit coverage in any manner as long as the limitations do not conflict with statutory provisions or public policy. *Marcus v. Hanover Ins. Co.*, 740 So.2d 603 (La. 1999) (citing *Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 630 So.2d 759, 763 (La. 1994)). The strict construction rule does not authorize the court to create a new contract or to alter the terms of the contract which are expressed with sufficient clearness to convey the plain meaning of the parties. *See Abbeville Offshore Quarters, Inc. v. Taylor Energy Co.*, 286 Fed. Appx. 124 (5th Cir. 2008), citing *Reynolds v. Select Props., Ltd.*, 634 So.2d 1180, 1183 (La. 1994).

To determine whether a policy affords coverage, the insured bears the burden of proving that the incident falls within the policy's terms, and the insurer bears the burden of proving the applicability of any exclusionary clause within the policy. *Doerr v. Mobil Oil Corp.*, 774 So.2d 119, 124 (La. 2000). At the pleadings stage, then, the Plaintiff must allege facts indicating that the

8

incident is covered by the Policy.

## IV.   ARGUMENT
### A.   PLAINTIFF'S COMPLAINT FAILS TO ALLEGE DIRECT PHYSICAL LOSS OF OR DAMAGE TO PROPERTY COVERED BY THE POLICY

The Complaint contains no plausible allegations that the Property has suffered "direct physical loss or damage." The Policy provides coverage for business income and extra expense losses only if such losses are the result of "direct physical loss of or damage to" the insured Property. (Policy, Exhibit A, Form CP 00 30 04 02, at p. 1 of 11). Further, business income and extra expense coverages are only provided during the "period of restoration," which is the time it takes to repair, rebuild or replace the Property. (Policy, Exhibit A, Form CP 00 30 04 02, at p. 9 of 11). Here, there has been no direct physical loss or damage to the Property, as evidenced by the fact that there is nothing to repair, rebuild or replace at the insured location.

An insured bears the initial burden of proving that a claim falls within the general coverage provided by an insurance policy. *Dickerson v. Lexington Ins. Co.*, 556 F.3d 290, 295 (5th Cir. 2009); *Doerr v. Mobil Oil Corp.*, 2000-0947 (La.12/19/00), 774 So.2d 119, 124; *Ho v. State Farm Mut. Auto Ins. Co.*, 03-0480 (La. App. 3 Cir. Dec. 30, 2003), 862 So. 2d 1278, 1281; *Sasser v. Wintz*, 2011 2022 (La. App. 1 Cir. 2012), 102 So. 3d 842, 851; *Myevre v. Continental Casualty Co.*, 245 So. 2d 785, 786 (La. App. 4 Cir. 1971). In other words, the insured must plead and then prove direct physical loss or damage to property.

Under the federal rules of civil procedure, pleading a cause of action that is supported by mere conclusory statements is insufficient to overcome a motion to dismiss. *Dune Energy, Inc. v. Chevron U.S.A., Inc.*, 125 F.Supp.3d 688, 691 (E.D. La., 2015). Here, Plaintiff makes conclusory allegations that it has suffered direct physical damage, but the Complaint is devoid of any mention of what physical damage occurred, how the physical damage occurred, and when the physical damage occurred. (*See generally* Doc. 1).

9

Here, the plain language of the Policy

requires direct physical loss or damage to the properties in order to trigger payment for a business income loss. The requirement that the loss be "physical," given the ordinary definition of that term is widely held to exclude alleged losses that are intangible or incorporeal, and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.

*In re Chinese Manufactured Drywall Prod. Liab. Litig.*, 759 F. Supp. 2d 822, 831 (E.D. La. 2010)

(citing 10A Couch on Ins. § 148:46 (3d. Ed. West 1998)).

In the context of a lawsuit seeking injunctive relief against an insurer for business income coverage related to COVID-19, one court already found that the disease, and the virus that causes it, do not cause physical loss or damage.  Teleconference, Order to Show Cause at 4-5*, Soc. Life Magazine, Inc. v. Sentinel Ins. Co. Ltd.,* No. 20-CV-3311-VEC (S.D.N.Y. May 14, 2020) (Transcript with oral findings attached hereto as Exhibit B). With regard to COVID-19, the Court in *Soc. Life Magazine* noted: "It damages lungs.  It doesn't damage printing presses." (*Id.* at 4:25-5:4). Additionally, another court recently granted summary disposition in favor of an insurer, finding there was no coverage for the plaintiff's COVID-19 related business income loss, since there was no direct physical loss or damage. *See* Hearing, Motion for Summary Disposition, *Gavrilides Mgmt. Co. v. Michigan Ins. Co.*, No. 20-000258-CB (Mich. Cir. Ct. July 1, 2020) ("Plaintiff just can't avoid the requirement that there has to be something that physically alters the integrity of the property. There has to be some tangible, i.e. physical damage to the property."). (Transcript with oral findings attached hereto as Exhibit C).

Moreover, the Policy only provides coverage for business income and extra expense losses incurred during the "period of restoration" which begins with the "direct physical loss or damage" and ends on the earlier of "(1) The date when the property at the described premises should be repaired, rebuilt or replaced . . . or (2) The date when business is resumed at a new permanent

10

location." (Policy, Exhibit A, Form CP 00 30 04 02, at p. 9 of 11). Thus, it follows that for there to be coverage under the Policy's business income or extra expense coverage, Plaintiff's loss must involve some physical damage to covered property that needs to be repaired, rebuilt, or replaced. As explained by the Southern District of New York, "the words 'repair' and 'replace' contemplate physical damage to the insured premises as opposed to loss of use of it." *Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co.*, 17 F. Supp. 3d 323, 332 (S.D.N.Y. 2014) (citations omitted); *see also Phila. Parking Auth. v. Fed. Ins. Co.*, 385 F. Supp. 2d 280, 287 (S.D.N.Y. 2005) ("'Rebuild,' 'repair' and 'replace' all strongly suggest that the damage contemplated by the Policy is physical in nature.").

Any other reading of the Policy to allow recovery for Plaintiff's Claim would render central contract terms superfluous. Under Louisiana law, words of an insurance policy must be given their generally prevailing meaning to determine the extent of the coverage. *Cadwallader*, 848 So.2d at 580. Thus, under the plain language of the Policy, coverage is only afforded for business income and extra expense losses if those losses are caused by direct physical loss or damage. Here, Plaintiff's Claim is solely economic in nature and does not relate to any sort of physical damage, and, therefore, is not covered under the Policy.

Accordingly, Plaintiff's Complaint does not allege any facts that trigger coverage under the Policy and its claims fail as a matter of law.

## B.  PLAINTIFF HAS NOT PLED A VALID CIVIL AUTHORITY CLAIM

As the basis for its civil authority claim, Plaintiff points to governmental orders issued by the State of Louisiana in March 2020. (Doc. 1 ¶¶ 16-18). On March 11, 2020, Louisiana Governor John Bel Edwards declared a statewide public health emergency for the State of Louisiana.

(Exhibit D, Louisiana Emergency Proclamation Number 25 JBE 2020).[3] Then, on March 16, 2020, Governor Edwards issued Proclamation JBE-2020-30, ordering that all restaurants cease on-premises consumption of food or beverages. (Exhibit E, Louisiana Proclamation Number JBE 2020-30, Additional Measures for COVID-19 Public Health Emergency). On March 22, 2020, Governor Edwards issued a stay-at-home order, which directed individuals to stay home, with the exception of engaging in essential activities. (Exhibit F, Louisiana Proclamation Number 33 JBE 2020, Additional Measures for COVID-19 Stay at Home). The Complaint references these three orders, apparently to support an allegation that Plaintiff is entitled to civil authority coverage. However, the orders at issue never prohibited Plaintiff access to the Property. As such, Plaintiff's allegations fail to trigger the Policy's civil authority coverage.

In Louisiana, the "insured bears the burden of proving that the incident giving rise to a claim falls with a policy's terms." *Illinois Union Ins. Co. v. La. Health Serv. & Indem. Co.*, 257 F.Supp.3d 763, 786 (E.D. La. 2017). The civil authority coverage requires direct physical loss of or damage to property *other than at the insured property*, and further requires that access to the insured property is prohibited because of that damage.[4] Plaintiff's effort to obtain civil authority coverage fails because the Complaint (1) alleges no such physical loss or damage, and (2) access to the Property has never been prohibited. (*See* Doc. 1; Exs. D-F).

In the Complaint, Plaintiff alleges that "it has suffered and will continue to suffer a direct physical loss of and damage to its property." (Doc. 1, ¶ 24). Plaintiff argues that the orders of Governor Edwards trigger the "Civil Authority" coverage under its Policy. (*See* Doc. 1, ¶ 25). As

---

[3] These government orders are a matter of public record. When ruling on a motion to dismiss, a district court consider "items subject to judicial notice, matters of public record, orders" and government websites. *Durr v. GOL, LLC*, 393 F.Supp.3d 476, 482-83 (E.D. La. 2019) (citing *Meyers v. Textron, Inc.*, 504 F. App'x 408, 409 (5th Cir. 2013)).
[4] Plaintiff may contend that the Policy's language does not require the damaged property to be near the insured premises. Even if this were true, Plaintiff's civil authority claim fails because it does not allege direct physical loss or damage to *any* property, near or far.

noted above, the civil authority coverage requires that a "Covered Cause of Loss" causes "direct physical loss or damage to property, other than at the described premises." A "Covered Cause of Loss" is defined as "risks of direct physical loss." Accordingly, the first requirement of the civil authority coverage is that there be direct physical loss that causes damage to property other than the insured property. Next, because of that damage to nearby property, a civil authority must prohibit access to the insured property. Plaintiff fails to sufficiently allege these necessary elements.

The plain language of the Policy makes clear that the civil authority coverage requires damage to property other than the described premises *and* an order of civil authority prohibiting access to the insured's property because of such damage. *See, e.g.*, *Dickie Brennan & Co. v. Lexington Ins. Co.*, 636 F.3d 683, 686-87 (5th Cir. 2011) ("Civil authority coverage is intended to apply to situations where access to an insured's property is prevented or prohibited by an order of civil authority issued as a direct result of physical damage to other premises in the proximity of the insured's property."). As explained above, COVID-19 does not cause physical damage or loss to property; therefore, Plaintiff cannot satisfy the conditions of the civil authority coverage extension. Even looking beyond that shortcoming, there are two more reasons why Plaintiff cannot fulfill the conditions of the civil authority coverage extension: (1) access to the Property has not been "prohibited;" and (2) the subject government orders were not taken "in response" to damaged property.

While the subject government orders prohibited Plaintiff from allowing customers from dining at the Property, Proclamation No. 33 JBE 2020 from Governor Edwards expressly provided at Section 4 (B) that the closure of businesses to the public did not prohibit access for necessary activities such as payroll, cleaning, and maintenance. (Ex. F, p. 3). No government order prevented

Plaintiff itself, or its employees, from entering the Property, and the government orders explicitly permitted Plaintiff to continue operations for take-out orders.  (Ex. E, p. 2).  Louisiana courts have already held that where a government order hampers access to insured property—but do not entirely *prohibit* it—such order is insufficient to trigger civil authority coverage. *Kean, Miller, Hawthorne, D'Armond McCowan & Jarman, LLP v. Nat'l Fire Ins. Co. of Hartford*, 2007 WL 2489711, at *1 (M.D. La. Aug. 29, 2007) (holding that civil authority provision was not triggered by Louisiana government order prior to Hurricane Katrina advising residents to stay off the streets because advisories did not "prohibit access" to the insured premises); *see also S. Hosp., Inc. v. Zurich Am. Ins. Co.*, 393 F.3d 1137, 1140 (10th Cir. 2004) (upholding denial of hotel operators' claim for lost business income sustained when customers cancelled visits due to order grounding of flights after the 9/11 attacks).

Further, there must be a "nexus" between the civil authority order and the physical loss or damage to the insured property for coverage to apply. *Jones, Walker, Waechter, Poitevent, Carrere & Denegre, LLP v. Chubb Corp.*, 2010 WL 4026375, at *3 (E.D. La. Oct. 12, 2010) (holding that the policy did not "insure against impairment of operations that occurs simply because a civil authority prohibits access unless the civil authority order meets the requirements of the policy."). The civil authority coverage requires Plaintiff to demonstrate that access to its Property was "prohibited" by civil authority. Since Plaintiff did not make any such allegations (nor indeed could it), and there is no nexus between the government orders and certain physical damage near the Property, the civil authority extension does not apply.

Second, the subject government orders were not issued "in response" to any physical property damage to nearby property. Rather, the orders were issued as precautionary measures to prevent the further spread of COVID-19. In such situations, the civil authority extension is not

triggered. *See Syufy Enter. v. Home Ins. Co. of Ind.*, No. 94-0756 FMS, 1995 WL 129229 (N.D. Cal. Mar. 21, 1995). As detailed in *Syufy*, after the return of the Rodney King verdict and subsequent riots, the cities of Los Angeles, San Francisco, and Las Vegas imposed dawn-to-dusk curfews. *Id.* at *1. An insured movie theater operator, who ran theaters in all three cities, submitted a business interruption claim because it closed its theaters during these curfew periods. *Id.* The court concluded there was no civil authority coverage because not only did the civil orders not specifically prohibit individuals from entering the theaters, but the "requisite causal link between damage to adjacent property and denial of access to a Syufy theater [was] absent." *Id.* at *2. In other words, Syufy had closed its theaters as a "direct result of the city-wide curfews," not as a result of adjacent property damage. Furthermore, the court noted that even though the curfews were imposed to "prevent" property damage, they were not the result of the damage itself. *Id.* at *2. Other courts have reached similar conclusions. *See United Airlines, Inc. v. Ins. Co. of State of Pa.*, 385 F. Supp. 2d 343, 353 (S.D.N.Y. 2005) (holding civil authority coverage did not apply to airport's business interruption claim arising from grounding of flights after the 9/11 attacks because the order to ground flights and bar access to the airport was "to prevent further attacks and as a matter of national security," not because of damage to the Pentagon); *City of Chi. v. Factory Mut. Ins. Co.*, No. 02-C-7023, 2004 WL 549447, at *4 (N.D. Ill. Mar. 18, 2004) ("The business interruption . . . was due to the ground stop order imposed by the FAA in order to prevent further terrorist attacks.").

Plaintiff fails to sufficiently plead that physical damage occurred due to COVID-19, nor that the government orders prohibited access to the Property. Indeed, as noted, the government orders at issue permitted the Plaintiff to continue operations for take-out business, if it so chose, and the orders deemed that "obtaining food" was an essential activity. (Ex. E, Sec. 3.A.).

Moreover, these government orders were not taken in response to any physical damage but were instead preventative measures issued for public health purposes. Accordingly, the Policy's civil authority coverage extension is not triggered.

### C. COVERAGE FOR CLAIMS RELATED TO "ORGANIC PATHOGENS" IS BARRED

Even should Plaintiff somehow satisfy the terms of the Policy's coverage grants, the Complaint nonetheless still must be dismissed because Plaintiff's Claim is excluded from coverage by the plain language of the Policy. When resolving insurance coverage disputes, courts "routinely consider policy exclusions in resolving motions to dismiss." *See e.g. In re Chinese Manufactured Drywall Products Liability Litigation*, 759 F.Supp.2d 822, 834-35 (E.D. La. 2010); *In re Katrina Canal Breaches Litig.,* 495 F.3d 191 (reviewing district court's order on motions to dismiss and motions for judgment on the pleadings based upon flood exclusions in homeowners' and commercial insurance policies); *Tuepker v. State Farm Fire & Cas. Co.,* 507 F.3d 346 (5th Cir.2007) (considering on appeal whether water damage coverage exclusion applicable after denial of motion to dismiss); *Mendler v. Derouen,* 2008 WL 5423489 (E.D. La. Dec. 29, 2008) (considering faulty workmanship coverage exclusion raised on motion to dismiss). Here, even if Plaintiff could demonstrate a claim within the Policy's coverage grants (which it cannot), coverage nonetheless is excluded for losses arising out of "organic pathogens," which the Policy expressly defines to include viruses. The endorsement provides:

> GSC-CP-007 (09/07) Total Mold, Mildew or Other Fungi Exclusion
>
> This endorsement modifies insurance provided by this policy:
>
> We do not cover loss, damage, cost, fine, penalty or expense *caused directly or indirectly by*, arising out of, in connection with, resulting from, contributed to *or related in any way by exposure* to or the manifestation, release, dispersal, seepage, migration, discharge, appearance, presence or growth of mold, mildew, mycotoxins, fungi or *organic pathogens*. Such loss or damage is excluded

regardless of any other cause or event that contributes concurrently or in any sequence to the loss or damage.

**The term "organic pathogen" or "organic pathogens" means** any organic irritant or contaminant including but not limited to the following: mold, fungus, bacteria, or **virus** including but not limited to their byproducts such as mycotoxins, mildew, or biogenic aerosol.

**This exclusion includes but is not limited to (1) any cost, expense** or charge to test, monitor, cleanup, remediate, remove, contain, treat, detoxify, neutralize, rehabilitate, **or in any way respond to** or assess the effects of mold, mildew, mycotoxins, fungi or **organic pathogen**; or (2) any cost, expense or charge in connection with the actual or alleged discharge, dispersal, seepage, migration, release, escape, exposure to, manifestation, appearance, presence, or growth of mold, mildew, mycotoxins, fungi or organic pathogens.

(Exhibit A, Policy, Form GSC-CP-007 09 07) (**emphasis added**).

As set forth below, SARS-CoV-2 is a virus that causes COVID-19.   Plaintiff's Claim, as alleged in the Complaint, arises directly or indirectly out of a virus, which is an excluded "organic pathogen."  As such, Plaintiff's Claim is excluded.

Louisiana law dictates that this exclusion be applied as written. *Paternostro v. Choice Hotel Intern. Service Corp.*, 2014 WL 6460844, *13 (E.D. La., Nov. 17, 2014) (finding that a bacterial exclusion broadly excluded coverage for two separate strains of bacteria, Legionella and Pseudomonas, even though the strains of bacteria were not specifically defined by the policy). Stated differently, when analyzing policy provisions "the words, often being terms of art, must be given their technical meaning. When those technical words are unambiguous and the parties' intent is clear, the insurance contract will be enforced as written." *Id.* at *10 (citing *Blackburn v. Natl's Union Fire Ins. Co. of Pittsburgh*, 784 So.2d 637, 641 (La. 2001)).

In *Paternostro*, the plaintiff sought to represent a putative class of individuals who contracted Legionnaires disease while using hot tubs and spas at defendant Choice Hotel's properties. *Id.* at *1-2.  Several of Choice Hotel's insurers declined coverage based on "bacteria exclusions."  At least one carrier's exclusion stated that it excluded claims "arising out of or in any

way related to the actual, alleged, or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any fungi or bacteria…." *Id.* at \*12. The court determined that the bacteria that caused Legionnaire's Disease was of course a type of bacteria, and the exclusion broadly served to preclude coverage entirely under that policy, dismissing the carrier from the case.

This logic applies here. The Policy explicitly excludes coverage for loss or expense caused "directly or indirectly by" or "related in any way . . . to" the "dispersal," "appearance" or "presence" of organic pathogens, which includes "virus." (Policy, Exhibit A, Form GSC-CP-007). There can be no question that SARS-CoV-2, which causes COVID-19, is a virus. Plaintiff concedes this fact in its Complaint. (Doc. 1 ¶¶ 8-12, 14-15).[5] Plaintiff's Claim was "a result of the [subject government orders] intended to reduce the effect of the ongoing global pandemic." (*Id.* at ¶ 34). Accordingly, the Claim as alleged is directly or indirectly caused by, or is related in any way to, a virus and is excluded from coverage under the Policy.

### D. COVERAGE IS BARRED BY THE MICROORGANISM EXCLUSION

The Policy also contains a Microorganism Exclusion, which also excludes coverage for Plaintiff's alleged losses. The Microorganism Exclusion provides:

> ***This policy does not insure any loss, damage, claim, cost, expense or other sum directly or indirectly arising out of or relating to***:
>
> mold, mildew, fungus, spores or other ***microorganisms*** of any type, nature, or description, including but not limited to any substance whose presence poses an actual or potential threat to human health.
>
> This Exclusion applies regardless whether there is (i) any physical loss or damage to insured property; (ii) any insured peril or cause, whether or not contributing concurrently or in any sequence; (iii) any loss of use, occupancy, or functionality; or (iv) any action required, including but not limited to repair, replacement, removal, cleanup, abatement, disposal, relocation, or steps taken to address medical or legal concerns.

---

[5] Plaintiff refers to COVID-19 as a virus on ten separate occasions in its Complaint.

This Exclusion replaces and supersedes any provision in the policy that provides insurance, in whole or in part for these matters.

(Exhibit A, Policy, Form LMA 5018) (*emphasis added*).  As set forth below, SARS-CoV-2, the coronavirus that causes COVID-19, is a microorganism.  Therefore, the plain language of this exclusion bars Plaintiff's Claim, which directly or indirectly arises from COVID-19.

As noted above, Louisiana law dictates that the exclusions be applied as written. *Paternostro v. Choice Hotel Intern. Service Corp.*, 2014 WL 6460844, *13 (E.D. La., Nov. 17, 2014).  The only two jurisdictions to have substantively addressed microorganism exclusions similar to the one in the Policy, have applied them as written. *See Certain Underwriters at Lloyd's of London Subscribing to Policy No. SMP 3791 v. Creagh*, 563 F. App'x 209, 211 (3d Cir. 2014) (holding that the district court correctly applied the microorganism exclusion to the plaintiff's claim); *Certain Underwriters at Lloyd's, London Subscribing to Policy No. W15F03160301 v. Houligan's Pub & Club, Inc.*, No. 2017-31808-CICI, 2019 WL 5611557, at *11 (Fla. Cir. Ct. Oct. 24, 2019) (concluding that "the Microorganism Exclusion bars coverage for the claims in this case").  In *Creagh*, the insured's claim arose after a tenant of its building died and the decomposition of the tenant's body damaged his apartment unit. *Creagh*, 563 F. App'x at 209. The United States District Court for the Eastern District of Pennsylvania held that the subject microorganism exclusion applied because the fluids that escaped the tenant's body and contaminated the unit contained bacteria, which are microorganisms. *See Certain Underwriters at Lloyd's London v. Creagh*, No. 12-571, 2013 WL 3213345, at *3 (E.D. Pa. June 26, 2013). The Third Circuit upheld the decision on appeal. *Creagh*, 563 F. App'x at 211.

Another court similarly recognized the unambiguous nature and enforceability of microorganism exclusions in the *Houligan's* case. In *Houligan's*, an insured suffered damage when its building was flooded with sewage and waste following a hurricane. *Houligan's*, 2019

WL 5611557, at *1. In applying the microorganism exclusion to the plaintiff's claim, the

*Houligan's* court stated:

> For better or worse, the parties bargained for an insurance policy that contains an extremely broad Microorganism Exclusion, one which supersedes and replaces any language in the Policy that might otherwise provide coverage for the loss in question. As noted, the exclusion applies even in the presence of an insured peril or cause that contributes concurrently to the insureds' loss. This Court must apply the Policy in a manner consistent with its plain language. Doing so leads the Court to conclude that the Microorganism Exclusion bars coverage for the claims in this case.

*Id.* at *11. Significantly, the *Houligan's* court looked to the Center for Disease Control's website

and dictionary definitions to find that E. Coli and enterococcus, both of which were present in the

sewage and waster, are bacteria, and thus, microorganisms that cause an actual or potential threat

to human health. *Id.* The decision in *Houligan's* provides a legal roadmap for this Court because

SARS-CoV-2 is a microorganism that causes an actual or potential threat to human health, and

any claim arising out of SARS-CoV-2, regardless of whether physical damage occurred or whether

there is some other contributing or concurrent cause, is therefore excluded from coverage.

Secondary sources, like those relied upon by the *Houligan's* court, support a determination

that SARS-CoV-2 is a microorganism. Such documents are integral to the Claim, and thus

appropriate for the Court to consider at the motion to dismiss stage. *Durr*, 393 F.Supp.3d at 482-

83. No less than the foremost U.S. governmental authorities in the fight against COVID-19—the

U.S. Department of Health and Human Services, National Institutes of Health and National

Institute of Allergy and Infectious Diseases—defined microorganism as "microscopic organisms,

including bacteria, viruses, fungi, plants, and animals."[6]  This is consistent with the findings of

---

[6] *Understanding Microbes in Sickness and in Health*, U.S. DEP'T OF HEALTH & HUMAN SERVS., NAT'L INST. OF HEALTH 47 (Jan. 2006) (Attached hereto as Exhibit G).

other governmental agencies.[7]  Adding additional support, scientific journals and textbooks also state that viruses are microorganisms.[8]  Even non-scientific sources such as Encyclopedia Britannica, for instance, lists the following "major groups of microorganism": bacteria, archaea, fungi, algae, protozoa, and viruses.[9]

As a result, the microorganism exclusion unambiguously excludes coverage for the Plaintiff's Claim.

### E.    COUNT II FAILS TO ALLEGE UNDERWRITERS HAVE BREACHED THE POLICY

Plaintiff fails to state a valid claim for breach of contract.  Plaintiff makes the threadbare allegation that Underwriters "conduct constitutes a breach of the contract as embodied by the aforementioned insurance policy." (Doc. 1, ¶ 48).  Plaintiff alleges that Underwriters engaged in "misconduct," but includes no specific factual allegations to suggest how the defendant improperly adjusted their claims or breached any duties owed to the plaintiffs established by Louisiana statutes.[10]  Under Louisiana law, a breach-of-contract claim has three "essential" elements": (1) the obligor's undertaking an obligation to perform, (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform resulted in damages to the obligee." *IberiaBank v. Broussard*, 907 F.3d 826 (5th Cir. 2018), quoting *Favrot v. Favrot*, 68 So. 3d 1099, 1108-09 (La. App. 4 Cir. 2011); *see also Vincent v. State Farm Fire & Cas. Co.*, 2020 U.S. Dist. LEXIS 84879

---

[7]    *What is a Microorganism?* NAT'L PARK SERV., U.S. DEP'T OF INTERIOR, 2 (April 2014), https://www.nps.gov/common/uploads/teachers/lessonplans/What%20is%20a%20Microorganism%20Activity%20 Guide2.pdf (listing viruses as one of the five categories of microorganisms).

[8]    *See, e.g.*, Wendy Keenleyside, MICROBIOLOGY: CANADIAN EDITION, § 1.3 (June 23, 2019) ("Viruses are acellular microorganisms."); Kathryn Nixdorff, et al., *Critical Aspects of Biotechnology in Relation to Proliferation*, 150 NATO SCI. SERIES II: MATHEMATICS PHYSICS & CHEMISTRY, 33, 33 (2004) ("Viruses are microorganisms").

[9]    *See Types of Microorganisms*, ENCYCLOPEDIA BRITANNICA (last visited May 6, 2020), https://www.britannica.com/science/microbiology/Types-of-microorganisms.

[10] Plaintiff does not allege Underwriters violated either La.R.S. 22:1892, La.R.S. 22:1973 or La. Civ. Code art. 1997. Therefore, Underwriters do not address the potential validity or lack thereof of any such potential claims as they are not currently before the court. However, to the extent any such claims are intended to be pled and/or are considered by this Court, such claims must fail where there is no valid claim for breach of contract. *See Vincent v. State Farm Fire & Cas. Co.*, 2020 U.S. Dist. LEXIS 84879 (E.D. La. May 14, 2020); *Hibbets v. Lexington Ins. Co.*, 2009 WL 1668505, *8 (E.D. La. June 12, 2009), aff'd, 377 Fed. App'x 352, 355 (5th Cir. 2010).

(E.D. La. May 14, 2020); *Hibbets v. Lexington Ins. Co.*, 2009 WL 1668505, at *5 (E.D. La. June 12, 2009), *aff'd*, 377 F. App'x 352 (5th Cir. 2010).

The judges in the Eastern District of Louisiana, referencing Supreme Court precedent, have routinely recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Vincent, supra,* 2020 U.S. Dist. LEXIS at *4, citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)); *Hibbets, supra,* 2009 WL at * 5, citing *Ashcroft v. Iqbal*, 556 U.S. 662, 173 L.Ed. 2d 868.

To state an adequate claim for breach of contract, Plaintiff's must allege that Underwriters failed to properly pay the claim when due. However, as noted above, the first element for a breach of contract claim under Louisiana law is an allegation of the obligor's undertaking an obligation to perform. Where an insured fails to adequately allege coverage triggering the policy, the insured cannot sustain its burden of establishing the first element of such a claim. *Vincent, supra*, 2020 U.S. Dist. LEXIS at *9 (dismissal appropriate where insured unable to establish property was insured location). Plaintiff has failed to sufficiently plead that coverage is provided by the Policy, as the express language of the Policy expressly contradicts Plaintiff's allegations that its losses are covered under the Policy. *Brown v. Am. Modern Home Ins. Co.*, 2017 WL 2290268, *5 (E.D. La. May 25, 2017) (finding that plaintiffs' complaint does not sufficiently allege that it was entitled to coverage, and therefore, plaintiffs did not sufficiently state a claim against the insurer for breaching the insurance contract). As Underwriters have shown that coverage does not exist under the Policy in the sections above, the claim for breach of contract must fail.

However, even if Plaintiff could potentially prove coverage exists, Plaintiff has failed to allege yet another critical element – that Underwriters *breached the contract*. Such is fatal to

Plaintiff's claims. *See Hibbets, supra,* 2009 WL at *12-13 (dismissal appropriate where insured could not establish breach of contract); *Brown v. Am. Modern Home Ins. Co.*, No. CV 16-16289, 2017 WL 2290268, at *2 (E.D. La. May 25, 2017) (plaintiff must allege the obligor failed to pay an obligation due in breach of the contract).

When taking Plaintiff's allegations as true, Underwriters have not breached the Policy because they have not denied coverage. (Doc. 1, ¶ 27). At the time Plaintiff filed the Complaint, Underwriters had not denied coverage, taken Plaintiff's examination under oath, or completed the necessary investigation, such that Underwriters could not have possibly breached the insurance contract. *See Assaf v. Allstate Indem. Co.*, 2011 WL 3178551 at *5 (E.D. La., July 27, 2011).

As two of the three elements for breach of contract are lacking from Plaintiff's Complaint, Count II for breach of contract must be dismissed.

## V.  CONCLUSION

Plaintiff has failed to satisfy its burden to plead facts that would give rise to a covered claim. Additionally, Plaintiff cannot allege facts that sufficiently demonstrate it has suffered a direct physical loss of or damage to its Property. Even if Plaintiff could allege a covered cause of loss, its claims are unambiguously excluded under the Policy. Because Plaintiff cannot plead a covered cause of loss under the Policy, it cannot assert its breach of contract action.

Thus, for the foregoing reasons, Underwriters respectfully request the Court dismiss Plaintiffs' Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

PD.29338001.1

Respectfully submitted,

**PHELPS DUNBAR LLP**


BY:     *Virginia Y. Dodd*
                Virginia Y. Dodd, Bar Roll No. 25275
                II City Plaza, Suite 1100
                400 Convention Street (70802-5618)
                Post Office Box 4412
                Baton Rouge, Louisiana 70821-4412
                Telephone: (225) 346-0285
                Facsimile: (225) 381-9197
                Email: ginger.dodd@phelps.com

                                AND

                Paul L. Fields, Jr.  (*Admitted Pro Hac Vice*)
                GA Bar Roll No. 003420
                FIELDS, HOWELL, LLP
                1180 W. Peachtree Street NW, Suite 1600
                Atlanta, Georgia 30309
                Telephone: (404) 214-1250
                Email:  pfields@fieldshowell.com

                                AND

                David E. Walker  (*Admitted Pro Hac Vice*)
                IL Bar Roll No. 6202056
                WILCOX MATOUSEK, LLP
                1 N. Franklin, Suite 3200
                Chicago, IL  60606
                Telephone: (312) 244-6704
                Email:  dwalker@walkerwilcox.com


ATTORNEYS FOR DEFENDANTS, CERTAIN
UNDERWRITERS AT LLOYD'S LONDON
SEVERALLY SUBSCRIBING TO POLICY NO.
02079/AML0001

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing Memorandum in Support of Rule 12(B)(6) Motion to Dismiss Complaint was filed on July 27, 2020, and was served via the Court's CM/ECF system on all Counsel of Record.

/s/ Virginia Y. Dodd

Virginia Y. Dodd, La. Bar No. 25275

ginger.dodd@phelps.com

25

PD.29338001.1